**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| DEBRA F. MINOTT, in her official capacity as Secretary of the Family and Social Services Administration, and LANCE RHODES, in his official capacity as Director of the Division of Family Resources, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:12-cv-00909-TWP-DML |
| KATHLEEN SEBELIUS, in her capacity as Secretary, U.S. Department of Health and Human Services, | ) ) ) ) | |
| Defendant. | ) ) | |

## ENTRY ON CROSS MOTIONS FOR SUMMARY JUDGMENT

This matter is before the Court on the Indiana Family and Social Services Administration's ("FSSA") and Indiana Division of Family Resources' request for judicial review of the United States Department of Health and Human Service's ("DHHS") decision denying in part FSSA's request for federal reimbursement of non-recurrent, short-term benefits in the amount of $26,762,466.00 for fiscal years 2009 and 2010.  The parties have filed cross-motions for summary judgment (Dkts. 23 and 25), which is the proper vehicle for judicial review.  *See Journey v. Sebelius*, No. 1:12-cv-00748-SEB-TAB, 2012 WL 5985592, at *5 (S.D. Ind. Dec. 21, 2012).  For the reasons stated herein, the parties' Motions for Summary Judgment are each **GRANTED in part** and **DENIED in part**.

## I. BACKGROUND

**A.     Legal Background**

The parties' briefs contain a detailed legal background of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, which created Temporary Assistance for Needy

Families ("TANF") program.  The Court will summarize only the relevant background here.  On February 13, 2009, in direct response to the nation's economic crisis and at the urging of President Obama, Congress passed the American Recovery and Reinvestment Act of 2009 ("ARRA"), commonly referred to as the Stimulus or Recovery Act.  The ARRA included a TANF Emergency Contingent Fund ("Emergency Fund") provision which created a $5 billion fund to help states, territories and tribes, in Fiscal Years 2009 and 2010 with specified types of expenditures due to the severe economic downturn.  The provision provided for states to receive up to 80% of qualified increased costs for three types of expenditures:  1) basic assistance, 2) non-recurrent short-term benefits, and 3) subsidized employment.  *See* Pub. L. No. 111-5 123 Stat. 115.  Just as with regular TANF monies, expenditures must accomplish a TANF purpose, which are defined by statute as: 1) providing "assistance to needy families so that children may be cared for in their own homes or in the homes of relatives;" 2) ending the "dependence of needy parents on government benefits by promoting job preparation, work, and marriage;" 3) preventing and reducing "the incidence of out-of-wedlock pregnancies" and establishing "annual numerical goals for preventing and reducing the incidence of these pregnancies;" and 4) encouraging "the formation and maintenance of two-parent families."  42 U.S.C. § 601(a).

To receive an allocation of TANF funds, a state must demonstrate it meets a maintenance-of-efforts ("MOE") requirement, meaning that it spends a certain level of funds on certain benefits and services to eligible families that are reasonably calculated to accomplish a TANF purpose.  Not all expenditures qualify for reimbursement.  States are not reimbursed for avoided costs such as purchase price discounts, rebates, and credits that a State receives; or foregone revenue, such as waivers, deductions, exemptions, or nonrefundable tax credits. For example, costs of illegal or unauthorized immigrants receiving TANF benefits do not qualify for

reimbursement.  However, MOE expenditures may include qualified costs borne by third parties

if certain requirements are met.  Particularly relevant, third-party costs must be verifiable and

meet applicable criteria in 45 C.F.R. §§ 92.3 and 92.24, as well as the requirement that there be

an agreement between states and third parties.  45 C.F.R. § 263.2(e)(1), (e)(2).

**B.**     **Case Background**

In Indiana, TANF is managed by the Administration for Children and Families ("ACF")

of the DHHS.  The Indiana FSSA submitted an application for $26,762,466.00 from the TANF

Emergency Fund for increased expenditures by third parties for non-recurrent short term

benefits.  The claimed expenditures consisted of:

> 1) Emergency "charity care" health care services to non-Medicaid/SCHIP covered
> children and families below 250% of poverty provided through three major
> hospital groups; ["Charity Care"]
>
> 2) United Way of Central Indiana created a Community Economic Relief Fund
> (Community Relief) and issued grants to nearly 50 community organizations to
> provide short-term direct assistance that stabilizes families, prevents
> homelessness or disruptions in employment, including food, housing, utilities,
> transportation, medical or child care or other interventions that keep families
> working and stable;
>
> 3) Feeding Indiana's Hungry, Inc. (FIsH) includes the value of food and volunteer
> time of Indiana's Food Banks to distribute food through food pantries to families
> with children 18 years of age or younger; and
>
> 4) Township Assistance is the value of emergency benefits provided by Indiana
> townships to help families with housing, utilities, food, health care, funerals,
> burials and other individualized supportive benefits, until regular TANF, SNAP,
> Medicaid and public housing benefits are provided.  ["Township Assistance"]

A.R. at 293.  FSSA supported its application with estimates coupled with available actual

expenditures, and converted annual data to quarterly data.  To estimate qualified expenditures,

FSSA relied upon United States Census data ("Census data"), which showed that 50.3% of

families below 250% of poverty include children under the age of 18.  FSSA further relied upon

two studies showing that roughly 1.9% of the population consisted of illegal or unauthorized

immigrants.   These percentages were used to calculate the total amount of expenditures requested.

Specifically, for Community Relief, FSSA reduced total expenditures by 52% by using income data collected by United Way agencies and Census data so that FSSA claimed only costs for eligible families with children, excluding non-qualified aliens.  For Township Assistance, FSSA also reduced total expenditures by 52% to ensure only costs for eligible families were claimed.  For Charity Care, FSSA used the actual uncompensated emergency medical services provided by the three hospital groups to indigent patients.  FSSA reduced the total amount of expenditures by 48%, relying on Census data and excluding non-qualified immigrants.  Finally, for FIsH, FSSA used socio-economic data captured for Hunger in America 2010.

Upon receipt of FSSA's application, ACF followed-up with FSSA with a series of questions.  In part, the first round of questions asked FSSA why estimation methodologies were used and why FSSA found them appropriate and reasonable.   FSSA responded to ACF's inquiries. In September 2010, ACF granted FSSA's FIsH application in the amount of $5,097,281.00.  To secure the remaining amounts in the event FSSA's application was approved, ACF conditionally awarded FSSA funds in the amount of $21,665,185.00, pending final approval.  ACF then posed additional questions to FSSA that expressed further concerns with FSSA's estimation methodologies. FSSA was asked to explain why its estimates were reasonable, because it was not apparent to ACF based on the application and previous responses. FSSA answered the questions and offered to further correspond with ACF.

On August 17, 2011, ACF issued its final determination denying FSSA's application for funds for Community Relief, Township Assistance, and Charity Care.  In a letter, ACF stated, "we have determined that charity care under the Indiana application is not a TANF MOE

4

expenditure. In addition, we have determined, the estimating methodologies for all three programs do not yield a reasonable estimate." A.R. at 415. In denying the application, the ACF explained it applied the following principles:

> . . . States must: (1) use actual data if reasonably available; (2) demonstrate that actual data are not reasonably available, if the State reaches that conclusion; and (3) describe the methodology and explain why it is reasonable (both in estimating the share of families it claims and the associated expenses), if the State seeks to use an estimation methodology. Please note that the limited scenarios in which we have allowed estimates are those in which requiring actual data would be infeasible or materially affect the ability to deliver the benefit or service.

A.R. at 415. Indiana appealed the decision to the DHHS Department of Appeals Board ("Appeals Board") pursuant to 42 U.S.C. § 610(b).

On April 4, 2012, the Appeals Board affirmed ACF's denial of FSSA's application. The Appeals Board found that the principles in the ACF denial letter were not new legislative rules subject to notice and comment procedure; that FSSA failed to show that actual data were unavailable; that FSSA's estimation methodologies were not reasonable; and that Charity Care expenditures were forgone revenue. Thereafter, FSSA sought judicial review in this Court of the Appeals Board's decision pursuant to 42 U.S.C. § 610(c)(1).

## II. <u>LEGAL STANDARD</u>

Under the Administrative Procedure Act ("APA"), a district court reviews the agency's action to determine if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Applying this standard requires the court to evaluate whether the agency's decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989) (citation omitted). The scope of the court's review under the arbitrary and

capricious standard is "narrow" and the court "is not to substitute its judgment for that of the agency." *Judulang v. Holder*, — U.S. —, —, 132 S.Ct. 476, 483 (2011) (citations omitted).

## III. <u>DISCUSSION</u>

The issue before the Court is whether ACF's denial of FSSA's application, and the Appeals Board's affirmation of the denial, was arbitrary and capricious. Specifically, FSSA contends that the denial was arbitrary and capricious because ACF relied upon, as FSSA characterizes, "new rules" that were improperly applied to FSSA's application for funds. Additionally, FSSA contends that its estimating methodologies were appropriate under applicable law, and alternatively, the "new rules." Finally, FSSA contends that hospital Charity Care is not foregone revenue. The Appeals Board affirmed the denial finding that FSSA's estimating methodologies yielded unreasonable estimated expenditures; ACF's determination was not based on invalid legislative rules; and the Charity Care expenditures were foregone revenue not properly included as MOE. The Court will address FSSA's three contentions below.

**A.** **Whether the Principles Applied by ACF Constitutes a New Legislative Rules**

The APA defines a rule as the "whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. § 551(4). This definition includes agency statements that legislate, referred to as legislative rules, as well as those that interpret existing law and regulations. In general, when an executive agency wants to promulgate a legislative rule, it must provide notice and an opportunity for comment, and it must issue a concise general statement of the rule's basis and purpose. 5 U.S.C. § 553. The APA exempts from these requirements "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. §

553(b)(3)(A); *Lincoln v. Vigil*, 508 U.S. 182, 196 (1993).  The APA does not define the term "interpretive rules."

The distinction between a legislative rule and an interpretive rule is critical in administrative law.  As the Seventh Circuit explained in *Hoctor v. United States Department of Agriculture*, 82 F.3d 165, 167 (7th Cir.1996):

> Notice and comment rulemaking is time-consuming, facilitates the marshaling of opposition to a proposed rule, and may result in the creation of a very long record that may in turn provide a basis for a judicial challenge to the rule if the agency decides to promulgate it. There are no formalities attendant upon the promulgation of an interpretive rule, but this is tolerable because such a rule is "only" an interpretation.  Every governmental agency that enforces a less than crystalline statute must interpret the statute, and it does the public a favor if it announces the interpretation in advance of enforcement, whether the announcement takes the form of a rule or of a policy statement, which the Administrative Procedure Act assimilates to an interpretive rule.  It would be no favor to the public to discourage the announcement of agencies' interpretations by burdening the interpretive process with cumbersome formalities.

The distinction is important for the agency, the regulated community, and the public in general. For example, agencies must have some flexibility and must be able to explain ambiguous terms in the statutes and regulations they are charged with enforcing.  *See Metro. Sch. Dist. of Wayne Twp. v. Davila*, 969 F.2d 485, 492 (7th Cir.1992) (citing *Am. Hosp. Ass'n v. Bowen,* 834 F.2d 1037, 1045 (D.C.Cir.1987)).  Further, the APA's notice-and-comment provisions provide some checks on agency authority.  Notice-and-comment procedures give the public an opportunity to participate in the administrative process, which consists of agencies that have been delegated legislative authority but are not elected by the public.  *See Hoctor*, 82 F.3d at 171; *Am. Hosp. Ass'n*, 834 F.2d at 1044.

The critical distinction between interpretive and legislative rules remains "far from crystal-clear," *Chem. Waste Mgmt., Inc. v. U.S. Envtl. Prot. Agency*, 869 F.2d 1526, 1534 (D.C.Cir.1989), and "enshrouded in considerable smog."  *Gen. Motors Corp. v. Ruckelshaus,*

742 F.2d 1561, 1565 (D.C. Cir. 1984) (*en banc*).  Nevertheless, the Seventh Circuit has identified several factors for a court to consider in determining whether a rule is legislative or interpretive. The court should consider the agency's characterization of the rule; the type of reasoning the agency used to formulate the rule from the regulations; and whether the rule creates new duties, rights, or obligations.  The rule is interpretive if the agency used appellate-court type reasoning, including reference to sources such as the text of the statute and regulations, the statute's legislative history, and case law.  *Davila*, 969 F.2d at 492.  Even if a rule creates new duties, rights, or obligations, the rule is interpretive if it simply clarifies an existing statute or regulation. *Davila*, 969 F.2d at 489.  If the agency created a specific rule from a vague standard that did not provide the agency with "something to interpret," the rule is legislative.  *Hoctor*, 82 F.3d at 170.

FSSA argues that the principles relied upon by ACF "had never been publically announced or articulated as requirements" and thus, the principles represent a "brand new substantive standard governing applications for TANF funds, including Emergency Fund funding."  Dkt. 24 at 11.  The Appeals Board found, in contrast, that the principles "merely articulated ACF's common sense approach under the Act, regulations and policy announcement[s] for considering when to permit a state to use a particular estimating methodology to support an Emergency Fund application for reimbursement of third-party MOE expenditures in lieu of actual date."  A.R. at 8.  For the reasons set forth below, the Court also finds that the principles are interpretative, and not legislative, rules.

First, the Court considers how the agency characterized its statement, although it is not dispositive.  *Davila*, 969 F.2d at 489.  As mentioned above, the Appeals Board concluded that the principles relied upon reflected prior agency statements and were not "new substantive legal requirements subject to notice and comment rulemaking."  A.R. at 7, 9.

Second, the Court considers the reasoning and purpose behind the agency statement. FSSA argues the three principles recited do not interpret 45 C.F.R. § 263.2(e), which governs how states count allowable costs borne by third-parties. Section 263(e)(1) requires that expenditures be "verifiable and meet[] all applicable requirements in 45 C.F.R. 92.3 and 92.24." Section 92.24(h)(6) also requires that costs "must be verifiable from the records of grantees and subgrantees or cost-type contractors." FSSA asserts that the denial letter "did not include any citation to the operative statute, and ACF did not evaluate legislative history or conduct any other sort of similar reasoned or researched analysis" to support the argument that the principles were interpretations. Dkt. 24 at 13.

FSSA is correct that ACF did not cite the specific statute or regulations upon which its decision relied; however, the agency did engage in reasoning consistent with the requirements that states provide verifiable data. In *Hoctor*, the court addressed whether a rule requiring an eight-foot security fence was a legislative or interpretive rule. 82 F.3d at 167–70. The underlying statute required that the Department of Agriculture provide regulatory standards for the handling, housing, feeding, watering, and sanitation of animals. *Id.* at 168. The Department employed the notice and comment procedure to implement a rule requiring that facilities housing animals use materials of proper "structural strength." *Id.* at 168. Later, the Department by internal memorandum, instituted the requirement that "dangerous animals" must be contained by a fence at least eight feet high. *Id.* The plaintiff was cited by the Department several times because his exotic animal facility did not have an eight-foot high fence. The Department insisted that this requirement was an interpretation of the structural strength regulation. *Id.* The Seventh Circuit disagreed. The court stated that "[e]ven if . . . the eight-foot rule is consistent with, even in some sense authorized by, the structural-strength regulation, it would not necessarily follow

that it is an interpretive rule.  It is only that if it can be derived from the regulation by a process

reasonably described as interpretation."  *Id.* at 170.  Like in *Hoctor*, ACF relied on principles

reasonably derived from the regulations through the process of interpretation.

> Specifically, the three principles relied upon were that states must:
>
> (1) use actual data if reasonably available; (2) demonstrate that actual data are not
> reasonably available, if the State reaches that conclusion; and (3) describe the
> methodology and explain why it is reasonable (both in estimating the share of
> families it claims and the associated expenses), if the State seeks to use an
> estimation methodology.  Please note that the limited scenarios in which we have
> allowed estimates are those in which requiring actual data would be infeasible or
> materially affect the ability to deliver the benefit or service.

A.R. at 24.  Contrary to FSSA's argument, the Court finds that it is a reasonable interpretation to

determine whether information is "verifiable" by first, requiring actual data when available;

second, by requiring a reasonable explanation of why actual data is not available; and third

requiring a reasonable explanation of the estimation methodology used.  Unlike in *Hoctor*, the

principles do not create an independent requirement.

To the extent that the principles may suggest a "tighter interpretation of broad existing

regulations," *Novelty v. Tandy*, No. 1:04-cv-01502-DFH-TAB, 2008 WL 3835655, at *16 (S.D.

Ind. Aug. 7, 2008), such is not dispositive.  *See Davila*, 969 F.2d at 490 ("We note that a new

position does not necessarily make a rule legislative than interpretive.").  Rather, FSSA has not

directed the Court to authority in which ACF indicated a broad acceptance of estimates.  In a

2009 policy statement for the TANF Emergency Fund, ACF indicated that it "anticipat[ed]"

accepting reasonable estimates, but that submitted estimates should subsequently be revised and

replaced with final caseload and expenditure figures.  Office of Family Assistance, The

Emergency Fund for TANF Programs, TANF-ACF-PA-2009-09 (Apr. 3, 2009),

http://www.acf.hhs.gov/program/ofa/resource/policy/pa-ofa/2009/pa200901.

Furthermore, in the correspondence between FSSA and ACF during the review process, ACF asked FSSA several questions and made statements about FSSA's estimating methodologies, including asking Indiana to clarify how citizenship/alienage eligibility criteria was taken into account, noting that for Charity Care, "[w]hen available, the State should report actual expenditures," A.R. at 308, and stating that, "[w]e are concerned that this is not an appropriate source for estimation.  Please explain why you think it is."  A.R. at 308.  Thus, FSSA was not caught off guard by ACF's requirements that estimating methodologies be reasonably explained and, in actuality, FSSA was aware that ACF had concerns about the methodologies.  Therefore, despite FSSA's insistence that it had never been aware of the principles relied upon by ACF, FSSA was generally aware of ACF's concerns.  FSSA was also given an opportunity to comply with the principles—although not in the exact wording contained in the denial letter—to further explain the methodology and its reasonableness and necessity.

For these reasons, the Court concludes that the three principles relied upon by ACF in its denial letter are not new legislative rules subject to notice-and-comment procedure.  *See Davila*, 969 F.2d at 492 ("If the mere delegation of rule-making authority meant all subsequent agency determinations were legislative, and had to meet the notice and comment requirements of the APA, agency functioning would be hamstrung.  The ability to issue interpretive rules 'preserve[s] agency flexibility" and "allow[s] agencies to explain ambiguous terms in legislative enactments without having to undertake cumbersome proceedings.'" (quoting *Am. Hosp. Assoc.*, 834 F.2d at 1045)).

## B.    Whether the Denial of FSSA's Application was Arbitrary and Capricious

The Appeals Board found that FSSA failed to demonstrate that actual data were not available and that its estimating methodologies were reasonable.  First, FSSA contends that the

Charity Care, Township Assistance, and the United Way/Community Relief programs were created "separate and apart" from TANF, prior to the passage of ARRA and Emergency Fund. Therefore, FSSA argues, "[i]t is not reasonable for these charity, service-based programs to go back and try to capture different date for the recipients of its services or convert it into a more accessible format."  Dkt. 24 at 17.  Before the Appeals Board, FSSA further argued that information about the number or percentage of families that included a child 18 years of age or under for the three programs was unavailable because "such information is only available in hard-copy case records . . . and is not included in any extractable, electronic data base."  A.R. at 52.  FSSA also specifically argued that the Health Insurance Portability and Accountability Act ("HIPPA") prevented the reasonable collection of demographic information for hospital Charity Care.

The Appeals Board determined that FSSA's explanations were not sufficient, reasoning that

> [i]ndeed, Indiana acknowledges that income and family composition determinations were in fact made for some recipients of charity care and that the United Way agencies and townships were capable of collecting and reporting such information.  Instead, Indiana essentially argues that it should be excused from the data collection and reporting requirements because it could not foresee, at the time the benefits were provided, that it might subsequently obtain emergency fund reimbursement for a portion of the third-party expenditures.

A.R. at 12.  The Appeals Board reasoned that FSSA's argument highlighted that FSSA failed to have appropriate agreements in place.  *See* 45 C.F.R. § 263.2(e).  The Appeals Board went on to conclude:  "This failure to meet one of the preconditions for obtaining reimbursement for third-party maintenance-of-efforts expenditures is hardly a reasonable basis to excuse Indiana from its responsibility to provide verifiable expenditure and caseload data to substantiate maintenance-of-efforts expenditures."  A.R. at 12–13.  The Appeals Board further rejected FSSA's reliance on

HIPPA, finding that "there are no restrictions on the use or disclosure of de-identified health information, which neither identifies nor provides a reasonable basis to identify an individual." A.R. at 13.

In the Court's view, the Appeals Board failed to consider the substance of FSSA's reasoning that the information was not reasonably available. Rather than address whether it is reasonable for a provider and state to convert large quantities of data not easily accessible, the Appeals Board relied upon the unsettled proposition that FSSA did not have proper agreements in place. This conclusion ignores, on the one hand, FSSA's assertion that it had "written agreements in place or nearly in place with required third parties," A.R. at 323, and on the other hand, that 45 C.F.R. § 263(e)(2) does not mandate what such agreements must contain. ACF contends that "[t]he agreement required by 45 C.F.R. § 263.2(e)(2) is intended to address topics such as necessary data collection," Dkt. 26 at 26, but does not cite to any agency source for support. Neither of the parties discuss what the actual content of the agreements between FSSA and the third parties might contain, and it would be speculation to assume the agreements did or did not contain discussion about the collection of demographic data. Therefore, the Court finds it was arbitrary and capricious to rely upon the lack of agreements in place between FSSA and the third parties. Instead, the Appeals Board should have considered the substance of FSSA's justification for its position that actual data is not reasonably available.

The Court does note that the Appeals Board did address and reasonably reject FSSA's HIPPA justification. Furthermore, FSSA's reliance upon comparing Charity Care, Township Assistance, and Community Relief to food banks is misplaced. ACF has made clear that food banks present "special circumstances" which do not easily provide for basing expenditures on individual determinations of need and family composition. In contrast, FSSA recognizes that

Charity Care and Township Assistance collect the relevant demographic information, but it is not reasonably available, as discussed above.  As for Community Relief, FSSA stated in its brief to the Appeals Board that it did not collect household composition information, see A.R. at 53, yet in its answers to ACF's correspondence FSSA stated that Community Relief collected income and household composition information, but not "family relationships," see A.R. at 337. Therefore, the record indicates that all three third parties collected relevant data that distinguishes them from the special circumstances of a food bank.  Furthermore, ACF has reasonably established why it distinguishes food banks from Charity Care, Township Assistance, and Community Relief.  Accordingly, the Appeals Board reasonably rejected the analogy as a basis for rejecting FSSA's justification for relying upon estimates and not actual data.

Before the Court can order remand, however, it must also determine if the Appeals Board arbitrarily and capriciously found that FSSA's estimates were unsound.  The Appeals Board found that regardless of whether actual data was available, ACF properly determined that FSSA's estimating methodologies were not reasonable.  FSSA used Census data and studies from the Department of Homeland Security and the Pew Hispanic Center to apply "across-the-board reductions to ensure that the totals requested did not exceed beyond the scope of the TANF-eligible population."  Dkt. 24 at 17.  FSSA utilized conservative estimates and "made assumptions that favored under-inclusiveness."  Dkt. 24 at 17.

The Appeals Board identified several weaknesses in FSSA's estimation methodologies. First, it found that by using Census data to approximate the number of families below a certain poverty level and family demographic, FSSA "failed to provide evidence to demonstrate that a general population survey of Indiana families below 250% of poverty would accurately represent the characteristics of those who were recipients" of Charity Care, Township Assistance, or

14

Community Relief.  A.R. at 15.  The Appeals Board noted that ACF has found that expenditures may vary greatly across demographic groups, "i.e., TANF-eligible recipients vs. non-TANF-eligible recipients."  A.R. at 15 (citation omitted).  Second, the Appeals Board found that FSSA's estimating methodologies did not reasonably account for expenditures for illegal or unauthorized immigrants.  The Appeals Board relied upon ACF's citation of a Congressional Budget Office publication stating that illegal or unauthorized immigrants tend to be undercounted in the Census or other population surveys.  It further noted ACF's citation to a Christian Science Monitor article that stated the Census "may capture as little as half of the undocumented population." A.R. at 15 (citing Brad Knickerbocker, *Illegal Immigrants in the US:  How Many Are There?*, Christian Science Monitor (May 16, 2006)).  Additionally, the Appeals Board stated that the assumption that expenditures on illegal or unauthorized immigrants "would be the same as those to attributable to other recipients is belied by studies suggesting that illegal aliens may use these types of programs at a disproportionately higher rate than the rest of the population."  A.R. at 16.

FSSA asserts that its reliance on the studies and "under-inclusive" estimates are reasonable.  The Court agrees with ACF, though, that "the fact that [FSSA] may have been under-inclusive when forming certain assumptions does not make the resulting estimates reasonable."  Dkt. 30 at 13.  However, the pertinent inquiry is whether the Appeals Board acted reasonably when it rejected FSSA's actual methodology.  The Appeals Board and ACF attack FSSA's use of studies with the citation of reports or studies that do not appear to carry heavier weight than FSSA's sources.  For example, the ACF faults FSSA for stating that "[t]here is no consensus in the literature we reviewed regarding whether unauthorized residents use more or less non-recurrent, short-term services than the rest of the population."  A.R. at 371.  ACF points to a report it cited to the Appeals Board that supports "the conclusion that illegal aliens access

programs such as Community Relief and Township Assistance more than U.S. Citizens and qualified aliens." Dkt. 26 at 31.  The report referred to is from the Center of Immigration Studies and states that nearly 26% of all Mexican immigrants live below the poverty line, including 62% living at or below 200% of the poverty level.  ACF used this study to state, "it is not unreasonable to conclude that the take-up rate of the Community Relief and township programs would be much greater among undocumented individuals than it would be among U.S. citizens and qualified aliens."  A.R. at 94.  Despite ACF's representation to the Court that this study supports the conclusion that illegal or unauthorized immigrants use services like Community Relief and Township Assistance more than citizens and qualified immigrants, ACF—much like FSSA—took relevant data and reached a conclusion through estimation and inference.  The Court finds this tactic, and the Appeals Board's adoption of ACF's reasoning, arbitrary and capricious.  The Appeals Board should have provided reasoned explanations for why FSSA's studies are unreasonable, but the ACF's comparable studies and use of estimation is superior.

However, the Court does not find that the Appeals Board was unreasonable in its treatment of FSSA's estimation methodologies for the amount of expenditures for TANF-eligible recipients vs. non-TANF-eligible recipients, as well as TANF households with children and those without.  To reach the household number, FSSA simply relied on Census data to determine that 48% of the Indiana population consisted of TANF-eligible households.  *See* A.R. at 303.  In response to ACF's follow-up questions asking FSSA to substantiate its methodology for this estimation specifically related to differences in costs, FSSA stated:

> For single-parent families receiving TANF the average household size is 2.79, and it is 4.01 for two-parent TANF families.  The average size for households without children is only one or two.  It would have been safe to assume, that because more people are being served in households with children, the amount of assistance provided for households with children is higher than that for childless households.  However, to be certain that we did not over-count, our methodology

> only assumed the average costs for households with children and childless
> households were identical.

A.R. at 370.  This response relies only on assumption, and has no data or evidence to support the assumption.

Further, the questions posed by ACF did put FSSA on notice that the methodology needed to be supported with further explanation, or that the application should be amended with additional data.  Specifically, ACF stated, "simply identifying the percentage of households with minor children does not in itself provide information as to whether their average costs are greater or lesser than for other households."  A.R. at 370, 373.  FSSA failed to reasonably cure the identified deficiencies.  The Appeals Board suggested that the ACF has, in other cases, accepted estimates based on "specialized surveys of the target population."  A.R. at 15.  FSSA has not indicated that such a survey is impracticable or unavailable.  Therefore, the Court finds it was not arbitrary and capricious to determine that a simple reduction of the Census data to account for TANF-eligible households and assuming costs for families with children and families without were the same, was not a reasonable estimation methodology.

In short, the Court has found that the Appeals Board's decision was arbitrary and capricious to the extent it affirmed the ACF's finding that actual data were unavailable and that FSSA did not provide a reasonable estimation methodology for expenditures on illegal or unauthorized immigrants.  However, the Court has found that it was not arbitrary and capricious to determine as unreasonable FSSA's estimation methodology for TANF-eligible households and related expenditures.  Given the Court's task in "examining the reasons for agency decisions— or, as the case may be, the absence of such reasons," *Judulang*, 132 S. Ct. at 484, the Court determines that the Appeals Board failed to give adequate reasons to support its decisions on the whole.  Remand is therefore appropriate to fully consider whether actual data was reasonably

available and the reasonableness of FSSA's estimation methodologies.   If, on remand, the Appeals Board determines that the actual data is reasonably available, and if allowed, it may be prudent for FSSA to amend its application after opportunity to secure the difficult-to-obtain data.

## C.  Whether Charity Care Expenditures are Foregone Revenue

FSSA contends that its application for Charity Care was denied improperly on the basis of foregone revenue.   Foregone revenue is characterized as "avoided costs" such as "contractor penalty payments for poor performance and purchase price discounts, rebates, and credits that a State receives."   45 C.F.R. § 260.30.   State tax measures, such as waivers, deductions, exemptions, or nonrefundable tax credits are also foregone revenue.   Relevant to the issue at hand, ACF has explained that "[i]f a State partners with a third-party organization to provide a service to [a] TANF-eligible individual at a discounted price," the State may not count the third party's foregone revenue as a qualified state expenditure.   A.R. at 310.   The Appeals Board found that this explanation "is on point for the situation of hospitals offering medical services to the uninsured or unable to pay at reduced rates or forgiving or writing off the unpaid services."   A.R. at 18.   FSSA argues that this explanation does not apply to Charity Care, which consists of the actual cost of uncompensated, emergency medical services.   FSSA argues it has not sought to "count as third-party MOE the value of health care actually expended by the three hospitals in providing charity care to TANF-qualified individuals."   Dkt. 24 at 20.   FSSA likens its request to the food given by a food bank:   "While the needy families *could* have been charged for the food, they were not.   Similarly, the needy families *could* have been charged by the hospitals for the full costs of their treatments, but instead they received charity care at no (or a lower) cost."   A.R. at 20.

ACF argues its conclusion that the hospitals foregoing revenue by not charging certain patients for services is a reasonable interpretation of the regulatory language and the interpretation is controlling unless "plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (quoting *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 359 (1989)).  FSSA attempts to discredit ACF's interpretation as arbitrarily suggesting that third parties must be in the business of providing free services at all times, like a food bank.  Instead, FSSA argues there is not a different character between Charity Care and a food bank providing free services to needy individuals.

The Court agrees with ACF and the Appeals Board.  "Hospitals . . . do generally charge for the services they provide and attempt to collect payment based on those charges (or some percentage of them)."  Dkt. 30 at 14.  The same cannot be said for food banks and, as argued by ACF, "[w]hat constitutes foregone revenue necessarily depends on the context in which the cost at issue is incurred."  Dkt. 30 at 14.  Therefore, it was not arbitrary and capricious to deny FSSA's request for Charity Care on the basis that the expenditures were foregone revenue.

**D.    Remand**

Having found that the Appeals Board's decision was arbitrary and capricious to the extent it affirmed the ACF's finding that actual data were unavailable and that FSSA did not provide a reasonable estimation methodology for expenditures on illegal or unauthorized immigrants, the Court finds remand to be the appropriate remedy. District Court cases in this circuit as recently as 2012 cite *Sec'y of Labor of U.S. v. Farino*, 490 F.2d 885, 891 (7th Cir. 1973), for the proposition that, "[t]he Supreme Court has indicated that the district courts have inherent power to remand administrative matters to agencies." *See Estate of Klockenkemper v. United States E.P.A.*, No. 10-cv-325-DRH-PMF, 2012 WL 967515,a t *2 (S.D. Ill. Mar. 21,

2012). Further, *I.N.S. v. Ventura*, 537 U.S. 12, 16 (2002), states that "[g]enerally speaking, a court of appeals should remand a case to an agency for decision of a matter that statutes place primarily in agency hands."  The determination of whether FSSA is entitled to funds is a matter best reserved for ACF.

## IV.  CONCLUSION

For the reasons set forth above, FSSA's Motion for Summary Judgment (Dkt. 23) is **GRANTED in part** and **DENIED in part**.  Likewise, ACF's Motion for Summary Judgment (Dkt. 25) is **GRANTED in part** and **DENIED in part**.  The decision of the Appeals Board is therefore **AFFIRMED** in that ACF's determination was not based on invalid legislative rules and it was not arbitrary and capricious to deny FSSA's request for Charity Care reimbursement. The decision of the Appeals Board is **REMANDED** in part for proceedings consistent with this Entry; specifically to fully consider whether actual data was reasonably available and the reasonableness of FSSA's estimation methodologies.

**SO ORDERED.**

Date: 09/30/2013

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Harmony A. Mappes
FAEGRE BAKER DANIELS LLP - Indianapolis
harmony.mappes@faegrebd.com

Ryan Michael Hurley
FAEGRE BAKER DANIELS LLP - Indianapolis
ryan.hurley@faegrebd.com

Jennie Leah Kneedler
UNITED STATES DEPARTMENT OF JUSTICE
jennie.l.kneedler@usdoj.gov

Shelese M. Woods
UNITED STATES ATTORNEY'S OFFICE
shelese.woods@usdoj.gov